Martin A. Muckleroy
**MUCKLEROY LUNT, LLC**
Nevada Bar No. 9634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Tel.: (702) 907-0097
Email: martin@muckleroylunt.com
[Additional Captions on Signature Page]
*Counsel for Plaintiff George Smith*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| GEORGE SMITH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PINNACLE ENTERTAINMENT, INC., ANTHONY M. SANFILIPPO, CARLOS RUISANCHEZ, CHARLES L. ATWOOD, STEPHEN COMER, RON HUBERMAN, JAMES L. MARTINEAU, JAYNIE MILLER STUDENMUND, and DESIRÉE ROGERS,<br><br>Defendants. | Case Number<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff George Smith ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Pinnacle Entertainment, Inc. ("Pinnacle" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Pinnacle, the "Defendants") for their violations of Sections 14(a) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Merger") between Pinnacle and Penn National Gaming, Inc. ("Penn").

2.      On December 17, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which each outstanding share of Pinnacle common stock not owned by Pinnacle or its subsidiaries will be converted into the right to receive 0.42 shares of Penn common stock (the "Merger Consideration") and $20.00 in cash.

3.      On February 8, 2018, in order to convince Pinnacle shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading S-4 independently violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning the financial projections for the Company and Penn that were prepared by the Company in recommending that its shareholders vote in favor of the Proposed Merger. The financial projections were also utilized by Pinnacle's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), in conducting the financial analyses in support of its fairness opinion.

**6.** It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Merger.

**7.** For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to Pinnacle shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

### JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Pinnacle is headquartered in this District.

### PARTIES

11. Plaintiff is, and at all relevant times has been, a holder of Pinnacle common stock.

12. Defendant Pinnacle is incorporated in Delaware and maintains its principal

3

executive offices at 3980 Howard Hughes Parkway, Las Vegas, Nevada 89169.   The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol "PNK."

13.     Individual Defendant Anthony M. Sanfilippo has served as Chairman of the Company's Board since May 2017, and as Chief Executive Officer since 2010.

14.     Individual Defendant Carlos Ruisanchez has served as a director of the Company since 2016, and as Chief Financial Officer since 2011.

15.     Individual Defendant Charles L. Atwood has served as a director of the Company since 2015.

16.     Individual Defendant Stephen Comer has served as a director of the Company since 2007.

17.     Individual Defendant Ron Huberman has served as a director of the Company since 2017.

18.     Individual Defendant James L. Martineau has served as a director of the Company since 2016.

19.     Individual Defendant Jaynie Miller Studenmund has served as a director of the Company since 2012.

20.     Individual Defendant Desirée Rogers has served as a director of the Company since 2012.

21.     The Individual Defendants referred to in paragraphs 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Pinnacle (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of November 6, 2017, there were approximately 57,452,535 shares of Pinnacle common units outstanding, held by hundreds of individuals and entities scattered throughout the country.   The actual number of public shareholders of Pinnacle will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

        i)      whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

        ii)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act;

        iii)      whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        iv)      whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      The Proposed Merger

**24.**      Pinnacle Entertainment, Inc. owns and operates 16 gaming entertainment businesses, located in Colorado, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nevada, Ohio and Pennsylvania.   In addition, Pinnacle holds a majority interest in the racing license owner as well as a management contract for Retama Park Racetrack outside of San Antonio, Texas.

**25.**      On January 2, 2018, Pinnacle and Penn issued a joint press release announcing the Proposed Merger, which states in pertinent part:

WYOMISSING, Pa. and LAS VEGAS, Dec. 18, 2017 (GLOBE NEWSWIRE) -- Penn National Gaming, Inc. (NASDAQ:PENN) ("Penn National") and Pinnacle Entertainment, Inc. (NASDAQ:PNK) ("Pinnacle") announced today that they have entered into a definitive agreement under which Penn National will acquire Pinnacle in a cash and stock transaction valued at approximately $2.8 billion. Under the terms of the agreement, Pinnacle shareholders will receive $20.00 in cash and 0.42 shares of Penn National common stock for each Pinnacle share, which implies a total purchase price of $32.47 per Pinnacle share based on Penn National's closing price on December 15, 2017. The transaction reflects a 36% premium for Pinnacle shareholders based on Pinnacle's closing price of $21.86 and Penn National's closing price of $22.91 on October 4, 2017. The transaction has been approved by the boards of directors of both companies and is expected to close in the second half of 2018.

Pinnacle owns and operates 16 gaming and entertainment facilities in 11 jurisdictions across the United States. Following the acquisition of Pinnacle and

the planned divestiture of four of its properties to Boyd Gaming Corporation (NYSE:BYD) ("Boyd") (as described below), Penn National will have significantly greater operational and geographic diversity and operate a combined 41 properties in 20 jurisdictions throughout North America. The transaction is expected to generate $100 million in annual run-rate cost synergies following integration and is anticipated to be immediately accretive to free cash flow in the first year. Pro forma for the divestitures and synergies, the acquisition reflects a multiple of 6.6x LTM EBITDA.

Timothy J. Wilmott, Chief Executive Officer of Penn National Gaming, commented, "By combining our highly complementary portfolios and similar operating philosophies, we will be able to leverage the strengths of both our companies and create an unparalleled experience for our regional gaming customers, while generating significant value for our shareholders and business partners."

Mr. Wilmott continued, "The combined company will benefit from enhanced scale, additional growth opportunities and best-in-class operations, creating a more efficient integrated gaming company. Going forward, we will have the financial and operational flexibility to further execute on our strategic objectives, while maintaining our track record of industry-leading profit margins and generating significant cash flow to reduce leverage over time. We look forward to welcoming Pinnacle's talented employees to our team and to further enhancing our status as North America's leading regional gaming operator."

Anthony Sanfilippo, Chairman and Chief Executive Officer of Pinnacle Entertainment, said, "Pinnacle is a terrific company whose success is due to the efforts of our more than 16,000 team members that focus every day on providing great service and memorable experiences for our guests. Tim and the Penn National team lead a high-quality organization that, like Pinnacle, has a long track record of operational excellence and accretive growth. We believe the combination will produce an even stronger gaming entertainment platform that builds on the individual accomplishments of both companies and benefits our collective team members, shareholders and guests."

Mr. Sanfilippo continued, "Pinnacle shareholders will receive immediate value from the cash consideration, as well as participation in the longer-term growth of Penn National that we expect will occur from the integration of these two great companies into a more efficient, larger-scale gaming entertainment platform. We are also pleased that Boyd Gaming will be acquiring our Ameristar properties in St. Charles and Kansas City, along with Belterra Casino Resort and Belterra Park. We look forward to working closely with Penn National and Boyd to seamlessly transition the Pinnacle businesses to their respective new owners."

26.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth.   For instance, the Company recently experienced a ***record quarterly performance*** with Consolidated Adjusted EBITDAR of $180.7 million in the second quarter of 2017.  In the press release reporting the 2O 2017 financial results issued on August 10, 2017, Individual Defendant Sanfilippo

stated: "Looking at the early results of the 2017 third quarter, the performance of our Company is off to a terrific start. In July, our Consolidated Adjusted EBITDAR and Consolidated Adjusted EBITDAR margin significantly exceeded the prior year, and performance so far in August has been strong."

27.     In sum, it appears that Pinnacle is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

**II.     The Materially Incomplete and Misleading S-4**

28.     On February 8, 2018, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Merger.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

***Financial Projections that Violate Regulation G and SEC Rule 14a-9***

29.     The S-4 fails to provide material information concerning the Company's financial projections, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger. S-4, 95-97.   The Company adjusted certain projections for Penn (the "Adjusted Penn Projections"), which were then given to the Company's financial advisor, J.P. Morgan, for its analyses. S-4, 98.   These financial projections were relied upon by J.P. Morgan in rendering its fairness opinion.   S-4, 107.   The S-4 also fails to provide material

information concerning Penn's financial projections, which were distributed by Pinnacle's management to its shareholders in connection with the Proposed Merger. S-4, 93-95.

**30.** Specifically, the S-4 provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics such as (1) EBITDAR, (2) EBITDA, and (3) Unlevered Free Cash Flow for both the Company and Penn; and (4) Recurring EBITDAR, (5) Recurring Free Cash Flow, and (6) Free Cash Flow for the Company. S-4, 96-98. However, it fails to provide the (i) line items used to calculate these non-GAAP metrics, nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). S-4, 95-98.

31. The Company defines EBITDAR in its own projections as: "earnings before interest income and expense, income taxes, depreciation, amortization, rent expense associated with the Meadows lease, pre-opening, development and other costs, non-cash share-based compensation, asset impairment costs, write-downs, reserves, recoveries, gain (loss) on sale of certain assets, loss on early extinguishment of debt, gain (loss) on sale of equity security investments, income (loss) from equity method investments, non-controlling interest and discontinued operations." S-4, 96. For the purposes of the Adjusted Penn Projections, EBITDAR is defined as: "earnings before interest income and expense, income taxes, depreciation, amortization, pre-opening, development and other costs, non-cash share-based compensation, asset impairment costs, write-downs, reserves, recoveries, gain (loss) on sale of certain assets, loss on early extinguishment of debt, gain (loss) on sale of equity security investments, income (loss) from equity method investments, non-controlling interest and discontinued operations." S-4, 98. However, the S-4 fails to provide the values of any of these line items, and fails to reconcile EBITDAR in either instance to its most comparable GAAP equivalent. S-4, 96, 98.

32.     For the Company's own projections, EBITDA is defined as: "EBITDAR (as defined in Note 4 above) less rent payments associated with Pinnacle's master lease with GLPI and less rent payments associated with the Meadows lease."  S-4, 96.    For the purposes of the Adjusted Penn Projections, EBITDAR is defined as: "EBITDAR (as defined above) less cash rent expenses." S-4, 98.   Nevertheless, with the exception of EBITDA, the S-4 fails to provide the values of any of these line items, and fails to reconcile EBITDA in either set of projections to its most comparable GAAP equivalent. S-4, 96, 98.

33.     The S-4 defines Unlevered Free Cash Flow in the Company's projections as: "EBITDA (as defined in Note 5 above), less tax expenses (on an unlevered basis), less capital expenditures, less other investing activities, less pre-opening and development costs, stock-based compensation and net asset write-downs and less changes in net working capital." S-4, 96. For the purposes of the Adjusted Penn Projections, EBITDAR is defined as: "EBITDA (as defined in Note 4 above), less tax expenses (on an unlevered basis), less capital expenditures, less other cash items (including Ohio track relocation fees, Jamul (advances) proceeds, earnout payments and capital lease payments), less stock-based compensation, less changes in net working capital and less certain other items." S-4, 98.    However, with the exception of EBITDA, the Company again fails to provide the values of any of these line items and fails to reconcile Unlevered Free Cash Flow in both the Pinnacle and Adjusted Penn Projections to its most comparable GAAP equivalent.  S-4, 96, 98.

34.     Recurring EBITDAR is defined as: "earnings before interest income and expense, income taxes, depreciation, amortization, rent expense associated with the Meadows lease, pre-opening, development and other costs, non-cash share-based compensation, asset impairment costs, write-downs, reserves, recoveries, gain (loss) on sale of certain assets, loss on early extinguishment of debt, gain (loss) on sale of equity security investments, income (loss) from equity method investments, non-controlling interest and

discontinued operations." S-4, 97. Yet again, the Company fails to provide the values of any of these line items, and fails to reconcile Recurring EBITDAR to its most comparable GAAP equivalent. S-4, 97.

35.     The S-4 defines Recurring Free Cash Flow as: "EBITDAR (as defined in Note 3 above), less rent payments associated with Pinnacle's master lease with GLPI, less rent payments associated with the Meadows lease, less net cash interest expense, less pre-opening and development costs, less cash taxes, less capital expenditures, less investment in working capital and other." S-4, 97. However, the Company again fails to provide the values of any of these line items with the exception of EBITDAR, and fails to reconcile Recurring Free Cash Flow, to its most comparable GAAP equivalent. S-4, 97.

36.     Lastly, the S-4 defines Free Cash Flow as: "Recurring Free Cash Flow (as defined in Note 4 above) less share buybacks and less Retama Park funding." S-4, 97. However, the Company fails to provide the values of the share buybacks nor Retama Park funding, and fails to reconcile Free Cash Flow, to its most comparable GAAP equivalent. S-4, 97.

37.     When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

38.     Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-

specific non-GAAP financial measures (as Pinnacle included in the S-4 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

39. The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DIs") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption, where Regulation G would not apply.[3]

40. More importantly, the C&DI clarifies when the business combination exemption does not apply:

---

[1]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html. (emphasis added).

[2]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3]     *Non-GAAP Financial Measures*, U.S. Securities and Exchange Commission (Oct. 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101. To be sure, there are other situations where Regulation G would not apply but are not applicable here.

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

41.     Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent that a third-party such as financial banker has utilized projected non-GAAP financial measures to render a report or opinion to the Board.   To the extent the Board also examined and relied on internal financial projections to recommend a transaction, Regulation G applies.

42.     Because the S-4 explicitly discloses that the Board considered "the   projected long-term   financial   results   of   Penn" to recommend voting in favor of the Merger Agreement, no exemption from Regulation G is applicable. S-4, 86.

43.     Thus, in order to bring the S-4 into compliance with Regulation G as well as cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 95-98, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.  At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures.   Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading.  Indeed, Defendants caution Pinnacle shareholders regarding the information contained in the financial projections, which incorporate non-GAAP financial metrics.  For example, with respect to EBITDAR, the Company stated:

EBITDAR is a non-GAAP financial measure and should not be considered as an

alternative to operating income or net income as a measure of operating performance or as an alternative to any other measure provided in accordance with GAAP.

S-4, 96.

### *The Materially Misleading Financial Analyses*

44.     The financial projections at issue were relied upon by the Company's financial advisor, J.P. Morgan, in connection with its financial analyses and fairness opinion.  S-4, 107.  The opacity concerning the Company's internal projections renders the financial analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a registration statement discloses internal projections relied upon by the Board, those projections must be complete and accurate.

45.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis* for Pinnacle, the S-4 states that J.P. Morgan utilized the non-GAAP metric unlevered free cash flows. S-4, 109.  Despite previously disclosing the method for calculating UFCF and the values, the S-4 fails to disclose the line items utilized to calculate UFCF nor a reconciliation.  The absence of this information renders J.P. Morgan's discounted cash flow analysis incomplete and misleading.

46.     The failure to provide a definition of projected after-tax UFCF is, in and of itself, and separate and apart from the mandates of Regulation G, materially false and/or misleading in violation of SEC Rule 14a-9 (17 C.F.R. 240.14a-9).  Because neither the method nor the line items used to calculate UFCF were disclosed, shareholders are unable to discern the veracity of J.P. Morgan's discounted cash flow analysis.  Without further disclosure, shareholders are unable to compare J.P. Morgan's calculations with the Company's financial projections.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

47.     These key inputs are material to Pinnacle shareholders, and their omission renders the summary of J.P. Morgan's discounted cash flow analysis incomplete and misleading.

As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the financial analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections, and then makes several key choices "each of which can significantly affect the final valuation."   Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).   Such choices include "the appropriate discount rate, and the terminal value . . . " *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value...  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

48.     Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor the Proposed Merger was based, in part on the following:

- *Financial Analyses of J.P. Morgan and Receipt of Fairness Opinion*.   J.P. Morgan's financial analyses in connection with the merger and its oral opinion rendered to the Pinnacle board, subsequently confirmed by delivery of a written opinion dated December 17, 2017, that, as of the date thereof and based upon and subject to the factors and assumptions set forth in such opinion, the merger consideration of $20.00 in cash and 0.42 shares of Penn common stock to be paid for each share of Pinnacle common stock pursuant to the merger agreement was fair, from a financial point of view, to the holders of shares of Pinnacle common stock [. . .]

S-4, 43.

49.     In sum, the S-4 independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.   As the S-4 independently contravenes the SEC rules and regulations, Defendants violated

Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Merger from Pinnacle shareholders.

50.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

53.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

54.     The failure to reconcile the numerous non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

57.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure… not misleading.*"  17 C.F.R. § 244.100(b).

58.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company and Penn.

59.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

60.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

61.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the registration statement.   The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.   Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

62.     Pinnacle is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

63.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

64.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

# COUNT III

### (Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act)

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Pinnacle within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as directors and/or officers of Pinnacle, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/ or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the S-4.

69.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The S-4 purports to describe the various issues and information that the

Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

72.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

1

## JURY DEMAND

2

Plaintiff demands a trial by jury on all issues so triable.

3

Dated:  February 20, 2018

4

Respectfully submitted,

5

**MUCKLEROY LUNT, LLC**

6

**OF COUNSEL:**

7

**FARUQI & FARUQI, LLP**

8
James M. Wilson, Jr.
Robert W. Killorin

9
685 Third Avenue, 26th Floor
New York, NY 10017

10
Tel.: (212) 983-9330
Email: jwilson@faruqilaw.com

11
Email: rkillorin@faruqilaw.com

12

*Counsel for Plaintiff George Smith*

13

By: */s/ Martin A. Muckleroy*
Martin A. Muckleroy
Nevada Bar No. 9634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Tel.: (702) 907-0097
Email: martin@muckleroylunt.com

*Counsel for Plaintiff George Smith*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28